Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence AFFIRMS the Opinion and Award of the Deputy Commissioner with minor modifications as follows:
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing and in a Pre-Trial Agreement as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between plaintiff and defendant at all relevant times.
3. Defendant, Yancey Nursing Center, is self-insured with Key Risk Management Services, Inc. as the servicing agent.
4. Plaintiff's average weekly wage at all relevant times was $336.89, yielding a compensation rate of $224.60.
5. Plaintiff was paid temporary total disability compensation from 31 May 1996 through 17 May 1997, when compensation was suspended pursuant to an Order to stop payment of compensation filed by Special Deputy Commissioner Becky A. Beane on 21 April 1997, effective 27 August 1996 in response to a Form 24 application.
***********
Based upon all of the competent evidence of record, the Full Commission adopts the findings of fact by the Deputy Commissioner with some modifications and finds as follows:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 37 years of age. She attended school through the 9th grade and subsequently obtained her GED in 1995. Her prior work history includes housekeeping duties at a hotel, five years of factory assembly-type employment and work in a sewing factory folding clothes. Prior to working for Yancey Nursing Center, plaintiff worked for Nu-Wray Inn washing linens, Rosenstock (a sewing factory), and Henredon (a furniture manufacturer) sanding drawers.
2. Plaintiff attended a six-week program at Maitland Community College earning her Certified Nursing Assistant license. In April 1994, she obtained employment at Yancey Nursing Center as a Certified Nursing Assistant (CNA).
3. Plaintiff regularly worked third shift, five days a week, approximately 56 hours a week.
4. As a CNA, plaintiff was required to load linens for each room on her assigned hall; change the linens on two beds per room; comfort patients; answer all calls for assistance made by patients on her assigned hall; and clean urinals, bed pans, commodes, refrigerators and wheelchairs.
5. Plaintiff worked on a two-person crew, attending patients on a designated hall. The two-member CNA crew would load a cart with linens and begin at one end of the hall by distributing the linens to residents whose linens were soiled. In addition to distributing linens, the two-member CNA crew would assist residents to bathroom facilities.
6. On 5 May 1996, plaintiff and her CNA partner were assisting a resident from the commode to a chair when the resident fell, causing plaintiff to fall as well.
7. Immediately thereafter, plaintiff felt a burning sensation in her low back, radiating into her left leg. She reported the incident to the charge nurse, Tracey Bennett, and continued to work the remainder of her shift although she was experiencing pain. She applied ice to her back while working. Plaintiff was not scheduled to work on 6 May.
8. Plaintiff sought initial treatment for her low back complaints from Dr. Richard Walton on 8 May 1996. Dr. Walton provided conservative treatment and authorized plaintiff to return to work on limited duty as of 9 May 1996, approving 27 of 31 job assignments necessary to the operation of the employer's nursing center which were considered light duty or sedentary in nature.
9. Dr. Walton approved the following tasks for plaintiff: "clean/straighten residents' closets and drawers, clean and sanitize bedpans, set dining room tables, and do simple cleaning of equipment." On 9 May 1996, plaintiff returned to work.
10. Plaintiff continued to work at a restricted level until she was taken completely out of work on 31 May until 4 June 1996, pending an orthopaedic evaluation.
11. On 4 June 1996, Dr. Walton took plaintiff out of work until plaintiff could undergo an evaluation by an orthopedist.
12. Plaintiff received conservative treatment from Dr. Tamara Ball, at Yancey Community Medical Center beginning 15 May 1996. On 4 June 1996, Dr. Ball diagnosed plaintiff as suffering from a low back strain with a possible herniated disc. Dr. Ball ordered plaintiff to undergo an MRI; and, Dr. Ball removed plaintiff from work beginning 4 June 1996. Defendant admitted plaintiff's right to compensation on a Form 60 filed at the Industrial Commission on 26 June 1996 and began paying temporary total disability compensation to plaintiff on 31 May 1996.
13. The MRI performed on 10 June 1996, revealed a mild central posterior disc protrusion and mild bilateral facet hypertrophy at the T12-L1 level, and degenerative changes at the L1-L2 level with a right posterior disc protrusion with some degenerative facet changes and mild spinal stenosis.
14. Plaintiff next presented to Dr. Donald Mullis, Asheville Orthopaedic Associates by referral on 25 June 1996. On physical examination, Dr. Mullis found plaintiff to have difficulty straightening and extending her back; getting on and off the examining table and positive straight leg raising of the left leg. Plaintiff expressed complaints of back pain, left buttock pain and posterolateral thigh and calf pain.
15. On 3 July 1996, Dr. Mullis continued plaintiff's time out of work for three weeks.
16. On 2 August 1996, plaintiff was given an epidural steroid injection. Dr. Mullis diagnosed plaintiff as suffering from a lumbar strain related to her on the job injury. Dr. Mullis continued plaintiff's time out of work for two more weeks beginning 2 August 1996. According to Dr. Mullis, plaintiff was not a candidate for surgery.
17. Dr. Mullis recommended a lumbar CT scan to rule out a left-sided disk herniation at L4-5 or L5-S1. The recommended CT scan was performed and showed moderate spinal stenosis at L1-L2, without evidence of disk herniation at any level. Consequently, Dr. Mullis recommended conservative treatment with continued anti-inflammatory medication and physical therapy.
18. Plaintiff participated in physical therapy and received a series of lumbar epidural steroid injections, following which she obtained relief.
19. On 16 August 1996, plaintiff again presented to Dr. Mullis. His examination at that time revealed no evidence of any paraspinal muscle spasm, in contrast to previous exam findings in June 1996. Similarly, Dr. Mullis' examination on this occasion revealed negative straight leg raising bilaterally. Consequently, Dr. Mullis instructed plaintiff to return to work, albeit in a light duty capacity. Dr. Mullis imposed temporary restrictions of no lifting greater than five pounds and no stooping, squatting or bending. The restrictions were to remain in effect for four weeks.
20. On 20 August 1996, Dr. Mullis reviewed a job description for a position at the nursing center considered to be light work and authorized plaintiff to perform all the assignments listed therein, except one.
21. The light duty job description approved by Dr. Mullis on 20 August 1996 listed the following job duty assignments:
a. Shaves — males and females as deemed necessary.
b. Nails — cut and clean. Report any unusual circumstances to Charge Nurse.
c. Ice — Pass ice to Skilled Nursing Facility once per shift.
d. Attend to dining room duty assisting residents with meal times.
e. Nourishments — Pass nourishments to designated residents and assist accordingly.
f. And duties as assigned by the Director of Nursing/Assistant Director of Nursing/Charge Nurse that fall within job descriptions.
Superimposed upon these duties were Dr. Mullis' restrictions of no lifting more than five pounds, no stooping, squatting or bending.
22. Plaintiff personally presented the job description to Dr. Mullis for his approval, and she did not express any reservations at that time about being unable to perform any of the listed job assignments. Similarly, plaintiff did not report any reservations or concerns about performing the duties of the position offered to her and approved by Dr. Mullis when she returned to him for a final visit on 12 September 1996, or at any other time subsequent thereto.
23. Included in the job description for the position provided to Dr. Mullis was the general provision stating: "And duties as assigned by DON/ADON/Charge Nurse that fall within job descriptions." According to the director of nursing, Jo Allison, this paragraph of the approved job description encompassed totally the list of limited duty job assignments previously approved by Dr. Walton in early May 1996 and was in effect a summary paragraph. All the assignments were necessary to the operation of the employer's nursing center, but it would be up to plaintiff's supervisors to determine whether any unapproved duties assigned fitted within plaintiff's restrictions.
24. On or about 12 September 1996, Yancey Nursing Center offered the light duty job to plaintiff. Plaintiff refused to accept the light duty job offered.
25. Plaintiff refused the light duty job because she had both performed the tasks identified on the light duty job description and had observed them being performed. She was aware of the physical requirements of these tasks and was certain she was physically incapable of performing them.
26. Plaintiff was unable to shave the patients and cut their nails because the patients often struggled with the nurse attempting to perform these duties and she was aware she would not be able to perform these tasks without re-injuring her back and possibly injuring the patients. Shaving patients often required bending and twisting in order to get into a position to perform the task.
27. Plaintiff was unable to perform the task of passing ice to the patients because it required the scooping of ice from a bin into a container on a rolling cart, pushing the cart down a hall, stopping at each patient's room, retrieving the patient's ice bucket, stooping or squatting down to the ice container on the cart, scooping ice into the bucket, standing from the stooped position, and returning the filled bucket to the patient's room. The Full Commission defers to the Deputy Commissioner's finding that plaintiff would have to stoop or squat in performing the duties of "passing ice" to the residents as the Deputy Commissioner was in a better position to determine the height of the ice cart from plaintiff's gestures.
28. Plaintiff was unable to supervise residents in the main day room because this often required moving or straightening patients in their chairs and wheelchairs, which was beyond plaintiff's lifting restrictions.
29. Plaintiff was unable to perform dining room duties because this task required plaintiff to carry trays of food to multiple residents; these trays of food weighed more than the lifting restrictions imposed by Dr. Mullis.
30. Plaintiff felt she would not be able to work at the Nursing Center within the limitations imposed by Dr. Mullis because the patients all knew her and relied upon her to assist them in manners which would require her to exceed the restrictions imposed by Dr. Mullis subjecting plaintiff to possible re-injury and the residents to injury. Plaintiff explained she would be unable to refuse assistance to one of the patients who requested help from her; and, she feared she would attempt to help the patient, and would either injure herself or the patient because of her physical infirmities.
31. On or about 20 February 1997, defendants filed a Form 24 Application to Terminate or Suspend Payment of Compensation. On 21 April 1997 an Administrative Decision and Order was issued by Special Deputy Commissioner Becky A. Beane approving the suspension of payment of compensation beginning 27 August 1996. The Form 24 Application to Terminate or Suspend Payment of Compensation was improvidently approved and should be vacated.
32. On 12 September 1996, plaintiff was re-examined by Dr. Mullis. At that time, she was continuing to experience a considerable amount of back pain. Dr. Mullis determined plaintiff had reached maximum medical improvement. He rated plaintiff as retaining a 10% permanent partial impairment to her back as a consequence of her work-related injury. Dr. Mullis also imposed a permanent restriction of lifting no more than 15 pounds with no repetitive stooping, squatting or bending.
33. On 22 September 1997, plaintiff returned to Dr. Mullis. At that time, Dr. Mullis revised his previous permanent limitations. He imposed permanent limitations of lifting no more than five pounds, no stooping, squatting or bending. Dr. Mullis also recommended that plaintiff undergo a Functional Capacity Evaluation to provide her with guidance of more specific activities and limitations. Defendants did not authorize such an examination.
34. The light duty job offered plaintiff was not suitable employment because plaintiff was unable to perform the job duties due to her pain level and the physical limitations resulting from her compensable injury. Plaintiff's testimony that she knew based on experience she could not perform the job duties of the job offered is accepted as credible and persuasive.
35. The light duty job offered to plaintiff was not a permanent job and was not a job readily available in the job market. The position was a culmination of job duties taken from other employee's job duties and was specifically created as a light duty post to be offered to plaintiff.
36. Defendant has not shown that plaintiff has been capable of earning wages at any time since 31 May 1996 in the same or any other employment considering her pain level and the physical limitations resulting from her injury.
***********
Based on the foregoing findings of fact and stipulations, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On 5 May 1996, plaintiff sustained an injury by accident as a direct result of a specific traumatic incident arising out of and in the course of her employment with Yancey Nursing Center. N.C. Gen. Stat. § 97-2.
2. As a result of her injury, plaintiff became totally disabled from employment on 31 May 1997 and has remained totally disabled through the date of hearing before the Deputy Commissioner and continuing.
3. Plaintiff's refusal to accept the employment offered by defendants was justified. N.C. Gen. Stat. § 97-32.
4. Plaintiff is entitled to receive from the defendants compensation for total disability compensation at the rate of $224.60 per week from 27 August 1996 and continuing until plaintiff returns to work earning the same or greater wages or until further Order of the Industrial Commission. However, the defendants are entitled to a credit for all amounts paid between 27 August 1996 and the time they ceased to pay compensation following the Administrative Decision and Order filed 21 April 1997.
5. Plaintiff reached maximum medical improvement on 12 September 1996. Plaintiff has sustained a 10% permanent partial impairment to her back as a consequence of her work-related injury. N.C. Gen. Stat. § 97-31. Plaintiff is entitled to elect her remedy between the benefits pursuant to N.C. Gen. Stat. § 97-31, or § 97-29; however, it is presumed plaintiff will elect the more favorable remedy and continue to receive benefits pursuant to N.C. Gen. Stat. § 97-29.
6. Plaintiff is entitled to have the defendants pay for medical expenses incurred or to be incurred as a result of the compensable injury as may be required to provide relief, effect a cure or lessen the period of disability including a functional capacity evaluation. N.C. Gen. Stat. § 97-2(19).
***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney's fee provided below, defendant shall pay plaintiff total disability compensation at the rate of $224.60 per week from 27 August 1996 through the date of the hearing before the Deputy Commissioner and continuing until plaintiff returns to work earning the same or greater wages or until further Order of the Industrial Commission, except the defendant is entitled to a credit for all amounts paid between 27 August 1996 and the time it ceased to pay compensation following the Administrative Decision and Order filed 21 April 1997. The accrued amounts shall be paid in a lump sum subject to a reasonable attorney's fee.
2. A reasonable attorney's fee of twenty-five percent (25%) of the compensation awarded to plaintiff in paragraph one above is hereby approved and shall be paid as follows: twenty-five percent (25%) of the accrued compensation shall be deducted from the amount due plaintiff and paid directly to plaintiff's counsel. Thereafter, plaintiff's counsel shall directly receive every fourth check due plaintiff.
3. Defendant shall pay all medical expenses incurred or to be incurred in the future by plaintiff for treatment of plaintiff's back so long as such examinations, evaluations and treatments tend to effect a cure or give relief when the bills for same have been submitted and approved through the procedures adopted by the Industrial Commission.
4. Defendant shall pay the costs.
5. The Administrative Decision and Order of the Special Deputy Commissioner approving defendant's Form 24 Application to Terminate or Suspend Payment of Compensation is VACATED.
S/_____________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/_____________ THOMAS J. BOLCH COMMISSIONER